UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Kiki Courtelis, | Case No. 22-CV-00779 (KMM\BRT) |
| Plaintiff, | |
| v. | **Order** |
| Kailen Rosenberg, and Global Love Mergers, Inc. d/b/a Kailen's Love and Life Architects, | |
| Defendants. | |

## I.  INTRODUCTION

Before the Court is Kailen Rosenberg's and Global Love Mergers, Inc., d/b/a Kailen Love and Life Architects ("KLLA")'s motion to dismiss for failure to state a claim under Rule 12(b)(6). [ECF No. 16]. For the reasons set forth below, Defendants' motion is GRANTED.

## II.  BACKGROUND

This case arises out of Plaintiff Kiki Courtelis's dealings with Defendant Kailen Rosenberg, an "elite matchmaker" and owner of Kailen Love and Life Architects ("KLLA"). Throughout their acquaintance, Ms. Rosenberg served as a matchmaker and business partner for Ms. Courtelis, who in turn provided significant funding and direction to Ms. Rosenberg's enterprises.

### A. The Matchmaking Service

In January 2018, Ms. Courtelis contacted Ms. Rosenberg to engage her matchmaking services. [Am. Compl. ¶¶ 14, 36, ECF No. 5]. Ms. Rosenberg provides these services through her firm "The Love Architects," a division of KLLA. On February 3, 2018, Ms. Courtelis signed a contract for the Elite Love Search Program with Ms. Rosenberg ("the Matchmaking Contract"). [*Id.* ¶ 39]. Ms. Courtelis paid $250,000 in consideration for the contract. [*Id.*].

The Matchmaking Contract disclaimed all warranties, express or implied, about "the suitability, success, or outcome" of the matchmaking. [Rosenberg Decl., Ex. 3, "Matchmaking Contract," at § 2.10, ECF No. 21]. It contained an arbitration clause, stating that all disputes "arising directly, indirectly, or derivatively out of or relating to [the Matchmaking Contract] or the breach, termination, or validity of [the Matchmaking Contract]" are to be resolved exclusively "through binding arbitration conducted before and according to the American Arbitration Association Commercial Arbitration Rules." [*Id.* at § 3.2]. It specified that the arbitration would be conducted under the law of Minnesota and conducted in Minneapolis. [*Id.*].

While engaging Ms. Rosenberg's matchmaking services, Ms. Courtelis alleged that she paid the following additional expenses:

- The hourly rates of Ms. Rosenberg and her staff for any work that they performed outside of her selected program, [Am. Compl. ¶ 41];
- Travel expenses for Ms. Rosenberg and her staff, [*Id.* ¶ 39];
- Travel expenses for a trip to New York, [*Id.* ¶ 44];

- A monthly recurring charge for Wasabi Publicity, Inc.'s Facebook Advertisement for Ms. Courtelis. [*Id.* ¶ 45].

Ms. Courtelis paid a total of $327,030.54 for these additional services. [*Id.* ¶ 98]. Ms. Courtelis also alleges that on several occasions, Ms. Rosenberg asked Ms. Courtelis to buy her luxury items "such as purses, clothing, and shoes from designer stores" and then deduct those expenses from the invoices "so it would appear that she earned less income." [*Id.* ¶ 42].

On top of these additional fees, after terminating the matchmaking contract, Ms. Courtelis received two invoices for $140,000 for services allegedly performed on her behalf. [*Id.* ¶ 99].

In September 2018, Ms. Courtelis asked Ms. Rosenberg to cease the matchmaking service, but requested that she resume those services in January 2019. [*Id.* ¶¶ 58-59]. Ms. Rosenberg refused, stating that Love Architects was not financially sound, that she could not afford to keep her remaining employee working on Ms. Courtelis's profile, and that she was too busy working on a separate project, a dating app called "the Lodge." [*Id.*]. To remedy this issue, Ms. Courtelis began paying the employee who had worked on her search directly through Love Shopping to continue the search. [*Id.*]. Ms. Rosenberg "interviewed around three men" and performed little additional work on the matchmaking service. [*Id.* ¶ 63].

**B. The Dating Apps**

Ms. Rosenberg then persuaded Ms. Courtelis to invest in the Lodge App. [*Id.* ¶ 47]. Ms. Courtelis alleges that Ms. Rosenberg made false representations regarding the dating app, including that Ms. Rosenberg had invested millions of dollars of her own money into

the development of the dating app. [*Id.* ¶ 53]. Ms. Courtelis alleges that she relied on those misrepresentations to make an investment in the Lodge App on June 22, 2018. Ms. Courtelis handled her investment through Love Shopping, LLC, of which she was the sole owner. [*Id.* ¶ 54].

A few months later, Ms. Courtelis and Ms. Rosenberg traveled to meet Rainmakers, the developer of the Lodge App, in Florida, and discussed a deadline for app development. [*Id.* ¶¶ 63–64]. Despite their assurances, the app faced consistent delays and missed its February 2019 launch date. [*Id.* ¶¶ 65–68]. Ms. Courtelis alleges that Ms. Rosenberg made constant, unilateral changes to the app, and attempted to thwart Ms. Courtelis from communicating directly with the developers. [*Id.* ¶ 65].

In December 2018, Ms. Courtelis's financial interest in the Lodge App was formalized legally, in the "Operating Agreement." She acquired a 37.5% ownership interest in the dating app in exchange for "the significant financial contributions she had made to the continued development of the App." [*Id.* ¶ 57]. Ms. Rosenberg and another matchmaking client, "WL," held the other 62.5% ownership interest. [*Id.*].

That winter, Ms. Courtelis decided to rebrand the Lodge App as the Love Shopping App. [*Id.* ¶ 68]. She and Ms. Rosenberg terminated their contract with the Rainmakers. [*Id.* ¶ 73]. They began to work with Twin Vision Studios ("TVS"), another application development company, on the rebranded app. [*Id.* ¶ 77]. TVS suggested that they make a website and a "mini app" as well. [*Id.*]. On March 22, 2019, Ms. Courtelis incorporated "The Dating App, LLC," and that company entered into the work agreement with TVS. [*Id.* ¶ 75].

The Love Shopping mini app was the first product released under the Love Shopping name on July 11, 2019. [*Id.* ¶ 77]. As for the website and the full app, Ms. Courtelis alleges that Ms. Rosenberg made false representations about their progress, made unilateral changes that delayed production, and managed the relationship with TVS until she was the sole individual communicating with them. [*Id.* ¶¶ 79–80, 83]. Ms. Courtelis was excluded from meetings and emails. [*Id.*].

Throughout this relationship, Ms. Rosenberg received a salary from Love Shopping, LLC and an American Express credit card linked to the business to pay for business expenses. [*Id.* ¶ 85]. The employees of the Love Shopping Dating App were also paid by the Love Shopping, LLC. Ms. Courtelis alleges that Ms. Rosenberg had her employees "perform services for The Love Architects and AH Love Design, her son Andrew Hanson's business." [*Id.* ¶ 86]. She also alleges that Ms. Rosenberg used Love Shopping, LLC's funds to pay for personal expenses. [*Id.* ¶ 87].

On July 22, 2019, Ms. Courtelis informed Ms. Rosenberg that she no longer wanted to invest in the Love Shopping Dating App. [*Id.* ¶ 90]. That same day, Ms. Rosenberg terminated the Matchmaking Contract by "removing all of Ms. Courtelis' Facebook ads." [*Id.* ¶ 91]. She did not provide notice to Ms. Courtelis of this termination.

### C. Procedural History

On April 15, 2020, Ms. Courtelis filed this lawsuit in the Scott County Circuit Court in Kentucky, alleging (1) fraudulent inducement, (2) negligent misrepresentation, (3) civil conspiracy, and (4) unjust enrichment. [ECF No. 1]. On April 17, she initiated an arbitration proceeding in Minneapolis for her claims regarding the Matchmaking Contract. The

arbitration proceeding was fully litigated and issued an award on January 18, 2022. [Rosenberg Decl., Ex. 7].

On June 20, 2020, Ms. Courtelis filed an Amended Complaint in Kentucky, adding causes of action against Ms. Rosenberg in her individual capacity. Ms. Rosenberg brought a motion to dismiss in the District of Kentucky, but the court denied the motion without prejudice due to improper venue. [ECF No. 11]. This case was transferred to the District of Minnesota pursuant to the "Operating Agreement" on April 1, 2022. [ECF No. 12]. On April 14th, Ms. Rosenberg filed her motion to dismiss, and the Court held a hearing on July 7, 2022.

### III.  LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard does not require the inclusion of "detailed factual allegations" in a pleading, but the complaint must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In applying this standard, the Court must assume the facts in the complaint to be true and take all reasonable inferences from those facts in the light most favorable to the plaintiff. *Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019); *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). But the Court need not accept as true any wholly conclusory allegations or legal conclusions that the

plaintiff draws from the facts. *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019).[1]

## IV.   DISCUSSION

In bringing her motion to dismiss, Ms. Rosenberg divides Ms. Courtelis' claims into two categories: (1) the Dating App Claims, Counts I–IV, include Ms. Courtelis' claims regarding the dating app investments for fraudulent inducement, negligent misrepresentation, civil conspiracy, and unjust enrichment; and (2) the Matchmaking Claims, Counts V–VI, encompass Ms. Courtelis' claims under the Matchmaking Contract for breach of contract, fraudulent inducement, and negligent misrepresentation. Ms. Rosenberg asks the Court to dismiss the Dating App Claims because they are subject to mandatory arbitration, and in the alternative, for lack of standing. She additionally argues that the Matchmaking Claims must be dismissed under the doctrine of collateral estoppel.

### A. The Dating App Claims

Ms. Rosenberg first argues that the Dating App Claims are subject to the mandatory dispute resolution clause in the Operating Agreements. The clause applies to "any dispute, disagreement, claim or controversy arising out of or relating to" the Operating Agreements "or the breach, termination, enforcement, interpretation or validity thereof, including the

---

[1] Ms. Rosenberg relies on several exhibits attached to her motion to dismiss. Generally, in ruling on a motion to dismiss under Rule 12(b)(6), the court must "ignore materials outside the pleadings but may consider materials that are part of the public record or do not contradict the complaint, and materials that are 'necessarily embraced by the pleadings.'" *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 955 (8th Cir. 2020) (quoting *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999)). Ms. Courtelis does not challenge Ms. Rosenberg's use of outside materials. The Court will consider these materials because they are either expressly referenced in the Complaint or are part of the public record.

determination of the scope or applicability of" the provision. [Def.'s Mem. at 6, ECF No. 18; Rosenberg Aff., Ex. 1 at 44, ECF No. 21]. The mandatory dispute resolution clause provides that in the event of such a dispute, "the matter, upon written request of a party, shall be referred to representatives of the parties for resolution." [Def.'s Mem. at 6, ECF No. 18]. Ms. Courtelis counters that she was not a signatory to these contracts, and her tort claims arise out of activities undertaken by Ms. Rosenberg prior to the signing of the Operating Contracts. Additionally, she argues that she and Ms. Rosenberg abandoned the Lodge entities, who were signatories to these contracts, in February 2019, and therefore those contracts do not apply to any subsequent events.

The Federal Arbitration Act applies to all arbitration clauses in contracts "involving transactions in maritime or interstate commerce." *Express Scripts, Inc. v. Aegon Direct Mktg. Servs., Inc.*, 516 F.3d 695, 699 (8th Cir. 2008).[2] Section 2 of the Federal Arbitration Act provides that a "written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

Generally, courts are responsible for deciding threshold questions of arbitrability, including the scope of the arbitration clause. *Eckert/Wordell Architects, Inc. v. FJM Props. of Willmar, LLC*, 756 F.3d 1098, 1100 (8th Cir. 2014). But where the contract delegates these

---

[2] Ms. Courtelis does not appear to contest that the Federal Arbitration Act applies to the mandatory dispute resolution clause in the Operating Agreements. Instead, her position is that the clause in those agreements does not apply to her. [*See generally* Pl's Resp., ECF No. 8.]

threshold questions to the arbitrator, "a court possesses no power to decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019). "That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Id.* Incorporation of standardized arbitration rules that delegate threshold questions to the arbitrator, such as the AAA Rules or the JAMS Streamlined Arbitration Rules, is sufficient to override the Court's authority over these questions. *Eckert/Wordell Architects, Inc.*, 756 F.3d at 1100 ("[T]he incorporation of the AAA Rules into a contract requiring arbitration [is] a clear and unmistakable indication the parties intended for the arbitrator to decide threshold questions of arbitrability."); *Femmer v. Sephora USA, Inc.*, No. 4:20 CV 676 JMB, 2021 WL 735685, at *5 (E.D. Mo. Feb. 25, 2021) (applying this reasoning to the JAMS Streamlined Arbitration Rules); *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 846 (6th Cir. 2020) (collecting cases).

The Operating Agreements in this case not only clearly provide for arbitration, but they also incorporate the JAMS Streamlined Arbitration rules. The Court therefore determines that it is proper for the Court to leave the question of whether the Dating App Claims are within the scope of the arbitration agreement to the arbitrator.[3]

---

[3] As the Operating Agreement delegated authority to decide threshold questions of arbitrability to the arbitrator, the Court does not consider the merits of the claims related to the Dating App for the purposes of this motion, including Ms. Rosenberg's arguments regarding failure to state a claim for unjust enrichment. Nor does the Court address Ms. Rosenberg's arguments concerning standing. Those can be raised, if appropriate, during arbitration.

### B. The Matchmaking Claims

Next, Ms. Rosenberg argues that Ms. Courtelis' Matchmaking Claims have already been arbitrated, and are therefore subject to the doctrine of collateral estoppel. "We look to state law in determining whether to apply issue preclusion." *Manion v. Nagin*, 394 F.3d 1062, 1066 (8th Cir. 2005).

The doctrine of collateral estoppel establishes that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981). It applies where: "(1) the issue was identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue." *Johnson v. Consol. Freightways, Inc.*, 420 N.W.2d 608, 613 (Minn. 1988). An arbitration award is considered a final judgment for the purposes of collateral estoppel. *Manion*, 394 F.3d at 1066–67.

The parties agree that the arbitrator issued a final judgment against Love Architects and KLLM for these exact same issues now raised in the Matchmaking Claims. [Opp'n at 21]. Ms. Courtelis disputes, however, that this final judgment applies to Ms. Rosenberg in her individual capacity because she was not a party, not in privity to a party, in the arbitration proceedings.

For the purposes of collateral estoppel, the final judgment is binding on the parties and their privies, "not only as to every matter which was actually litigated, but also as to every matter which might have been litigated, therein." *Beutz v. A.O. Smith Harvestore Prods.,*

*Inc.*, 431 N.W.2d 528, 531 (Minn. 1988). A party is in privity with a party to the litigation when they "(1) had a controlling participation in the first action, (2) had an active self-interest in the previous litigation, or (3) had a right to appeal from a prior judgment." *All Finish Concrete, Inc. v. Erickson*, 899 N.W.2d 557, 568 (Minn. Ct. App. 2017). Presidents and sole shareholders of companies have such a controlling interest, especially where they are representing their companies in the litigation. *See id.* ("Erickson had a 'controlling participation' in the *Stenerson Bros.* case, as reflected by his being president and sole shareholder of the corporation[.]"); *accord Twin City Pipe Trades Serv. Ass'n, Inc. v. Wenner Quality Servs., Inc.*, 869 F.3d 672, 678 (8th Cir. 2017) (finding that a corporation is in privity with its two shareholders). Ms. Rosenberg had a controlling participation in the arbitration proceeding, and she personally took part in the arbitration in her capacity as the sole owner of KLLA. Even though she did not participate to defend against claims brought against her individually, the Court finds that she was in privity with KLLA during the proceeding.

Ms. Courtelis also had a full and fair opportunity to be heard. The full and fair opportunity to be heard "generally focuses on whether there were significant procedural limitations in the prior proceeding, whether the party had the incentive to litigate fully the issue, or whether effective litigation was limited by the nature or relationship of the parties." *All Finish Concrete, Inc.*, 899 N.W.2d at 568. Ms. Courtelis asserts that she did not have such an opportunity because Ms. Rosenberg requested dismissal of the claims against her personally due to lack of jurisdiction, and Ms. Courtelis voluntarily dismissed the claims. Voluntary dismissal of claims is not sufficient to show that a party does not have a full and fair opportunity to bring those claims. Ms. Courtelis chose to dismiss her claims against Ms.

Rosenberg without any mandate from the arbitrator, and must therefore face the consequences of that decision.

Accordingly, Ms. Courtelis' claims regarding the matchmaking service must be dismissed under the doctrine of collateral estoppel.

## V.     CONCLUSION

Based on the foregoing, Defendant Rosenberg's Motion to Dismiss is **GRANTED.** Plaintiff's Amended Complaint is **DISMISSED WITHOUT PREJUDICE** as to Counts I-IV and **DISMISSED WITH PREJUDICE** as to Counts V–VI.

**IT IS SO ORDERED.**

Date: September 19, 2022

*s/Katherine Menendez*
Katherine Menendez
United States District Judge